## Case No. 18,140.

### The YORK.

#### [3 Adm. Rec. 321.]

Superior Court, S. D. Florida. March 23, 1846.

SALVAGE COMPENSATION—PROFESSIONAL WRECK-
ERS ON FLORIDA COAST—MISCONDUCT OF CREW.

[1. $13,000 upon a valuation of $95,000 award-
ed to professional wreckers for getting a ship
off of Florida Reef in a condition to proceed on
her voyage, the vessel having been in consider-
able danger, though not thumping on the bot-
tom, and the weather being fair, the services
occupying about 14 hours, and consisting in
transferring 363 bales of cotton to the wrecking
vessels, and thus floating the ship.]

[2. The conduct of the crew of a stranded ves-
sel in refusing to assist in getting her off after
wreckers were employed, unless promised extra
compensation out of the salvage, is deserving of
the severest reprobation, and, although such a
promise is given, the court will prohibit the
payment of any part of the salvage to them.]

[Proceeding by Willian Pent and others
against the York and her cargo for salvage.]

S. R. Mallory, for libellants.

Wm. R. Hackley, for respondent.

MARVIN, District Judge. The ship York,
Dixon, master, while on a voyage from New
Orleans to Liverpool, in the early part of the
night of the 17th instant, struck upon the
Florida Reef, where she remained until she
was relieved and got off by the wreckers.
The cargo consisted of 2,186 bales of cotton,
3,140 barrels of flour, and a small quantity
of staves. The ship and cargo may be fairly
estimated as worth $95,000. Soon after the
ship struck, the master got out a boat,
sounded the depth of the water around her,
carried out a small anchor, and endeavored
to heave the ship off. He also removed dur-
ing the night some fifty or more bales of
cotton, from the after to the forward part of
the ship, with the view to bringing her on a
more even keel. He continued his efforts
during the night to get the ship off, but did
not succeed. About nine o'clock the next
morning, the libellants, regular wreckers on
this coast, came to his assistance. They
commenced discharging the ship's cargo on
board their vessels, and continued at this em-
ployment, and heaving at the windlass, dur-
ing the day, and until about eleven o'clock
at night, when, having discharged three hun-
dred and sixty-three bales of cotton, the ship
came off the reef. After the employment of
the wreckers, the ship's crew, except the
officers and boys, refused duty, being excit-
ed to this refusal by one of their number,
under the pretence that the ship was now a
wreck, and that they were not bound to
work, unless paid a part of the salvage.
They remained disobedient and insubordi-
nate until, at last, the master was induced
to request the wreckers to promise them two
dollars each a day for their services. This
promise being made, they returned to their
duty.

The ship and cargo were safely brought into
this port, and, it being ascertained by the
report of expert divers, that the ship had
not been so much injured on the reef as to
render her unfit to perform the voyage, and
did not require to be discharged and hove
out, the wreckers, at the request of the mas-
ter, delivered the cotton that had been taken
out of her again on board, and the ship is
now in a condition to proceed again on her
voyage. Such are the principal facts in this
case, and it is impossible that they should
not impress the mind of the court favorably
as to the merit and good conduct of the
salvors. The ship was ashore upon a hard
and rocky bottom, and upon one of the outer
reefs. She was surrounded by shoals. She
had been driven more than a foot out of wa-
ter by the force with which she struck. She
did not thump or rise or fall with the tide,
but remained the most of the time apparently
still and fast. She could be got off only by
being lightened. This could have been ac-
complished by the master with an obedient
crew in time. He must have thrown over-
board as many bales of cotton as were taken
out of her by the wreckers, before he could
have got her off. But this he could not do in
the same time in which the wreckers dis-
charged the cotton. The cotton was difficult
to break out, and a strong force was neces-
sary to dispatch. The wreckers brought
twenty-nine men, besides thirteen men from
the sloop Texas, into the enterprise. To these
were added the ship's company. They all
labored energetically, and yet they were
able to discharge only 363 bales of cotton in
about ten hours. It is idle to suppose that
the master, if he had had an obedient crew
could have got this ship off the first or sec-
ond day, without other assistance. It is pos-
sible that the ship might have remained sev-
eral days on the reef without sustaining ma-
terial injury. It is agreed on all sides that
the weather was moderate, and that the ship
did not thump, except at the time she came
off the reef. But is it probable that she
would have remained there several days, or
even until the next high water without se-
rious and material injury? Although the ship
did not rise and fall with the sea, or thump,
yet she chafed and ground upon the bottom,
and had sufficient motion to have chafed a
hole through her bilge in no very long pe-
riod of time. Had the master got the ship
off without assistance, she would still have
been surrounded with reefs and shoals, of
which he was totally ignorant. But it is to
my mind doubtful whether he would have
succeeded in extricating his ship from her
difficulties without other assistance than his
crew, even if they had been obedient; and,
when we consider that his crew was in an
insubordinate and almost mutinous state, the
doubt in regard to his success is very much
increased.

It is natural enough to suspect that the re-
fusal of the crew to do duty after the wreck-
ers came on board was owing to the improper

tampering with them. by the wreckers, and, although none of the wreckers are charged by the master with any such misconduct, yet I felt it my duty to investigate this matter fully on the trial. The result of the investigation was to exonerate any of the salvors from any such charge. I am glad that it is so, for, had they, or any of them, been implicated in bringing about the refusal of the ship's company to do duty, I should have forfeited their salvage. Such an offense will never be permitted to pass unpunished in this court. But I am satisfied, from the testimony, that the ship's crew were influenced in determining not to do duty, without being promised pay by the salvors, by one of their number, whose character is fully indicated and known among seamen by the term "Sea Lawyer"; and from all the circumstances of the case, and the fact that this man had once been a wrecker on this coast, and instigated the crew, after their arrival in this port, to insist upon a discharge of the ship's cargo and heaving the ship out, before they would consent to proceed on the voyage, I am quite satisfied of the probability, at least, that the crew would have very soon refused to do duty, when the ship was on the reef, whether any wreckers had come to their assistance or not. The conduct of this man deserves punishment.

Under all these circumstances, it appears to me that it would be folly to say that this ship and cargo were not in very considerable peril, and that the services of the wreckers have not been of very considerable value to them. The fact that they got the ship off in the short period of about twelve or fourteen hours ought not to be considered as lessening the merit of their services, but the contrary. The fact that she is but little injured too ought not to be regarded as evidence that she was in but little danger, and that therefore the salvage ought to be less. The fact that the ship was in danger is evident from her position on the reef, the winds, the tide, or want of tide, and the state of the crew. And the fact that the ship was in a short period of time rescued from danger comparatively uninjured, by the prompt, active, and persevering efforts of the wreckers, adds greatly to the value of their services. Had the ship remained on the reef until the next high water, no one can say that she would not have been so badly injured as to require her discharge and repairs in this port, several weeks interruption in her voyage, the incurring of heavy expenses for wharfage, storage, repairs, &c. The fact, then, that these wreckers rescued this property in the shortest possible period of time is one of much merit, and should enhance their compensation. Their labors, so promptly and so actively rendered, have resulted in saving the ship in a sound and fit condition to proceed on her voyage, and, had this promptness and activity been wanting, it is probable that the ship would have been so injured as to require her discharge and repairs.

The wreckers are not transient voyagers, falling in accidentally with this ship while ashore, and rendering her assistance. Had this been the case, a very small proportion of the value of the ship and cargo might be deemed an adequate compensation to the salvors. But they are regularly and solely employed, under the license of this court, in the business of cruising along the reef, and rendering assistance to vessels situated as this was. The salvage decreed them by this court constitute their sole means of livelihood, and enable them to defray the expenses of their vessels, and to keep them well manned, equipped, and fitted to the business in which they are engaged. The dangers of the navigation and the liability to shipwreck on this coast have made their steady and regular employment in this business necessary to the interests of general commerce and the cause of humanity. Sound policy requires their encouragement within proper limitations.

Before deciding upon the compensation which ought to be decreed the wreckers in the present case, it may be useful to advert to a few cases analogous to the present, decided in this court by my predecessor. The case of The Hector [unreported] was decreed in 1833. This ship got ashore upon Conch Reef. The weather was calm, and continued so for several days after the ship was got off. The wreckers, after loading two of their vessels, succeeded in heaving the ship off. The master insisted at the trial that his ship was in no immediate danger; that he accepted the assistance of the wreckers as a matter of prudence and precaution, and not because he supposed their services were necessary to the safety of the ship and cargo; that, as the weather continued favorable, he might have removed the cargo, and got at and thrown overboard his ballast, and in this way lightened and hove his ship off without the assistance of wreckers. The judge did not regard the ship, under the circumstances, in great danger, yet he thought the prompt and active exertions of the wreckers entitled them to a reasonable compensation, and that $10,000 was not an unreasonable recompense, the ship and cargo being valued at $70,000. The case of The Austerlitz [unreported] was decided in 1837. This ship got ashore in the night, and remained ashore three days before the master would take assistance. During this time he carried out his anchors, and used all his exertions to get his ship off, but without success. He then employed the wreckers to lighten and get the ship off. They transhipped on board their vessels 400 bales of cotton, when she came off. The weather continued calm for several days after the ship was relieved. The cargo consisted of 1,567 bales of cotton, valued at $61,740. The judge decreed $11,800 salvage. In the case

of The Ella Hand [Case No. 4,369], the weather was calm, and continued so for several days after the vessel was relieved. The wreckers lightened her by loading two of their vessels, and hove her off. The ship and cargo were valued at $33,200. The master contended at the trial that he might have saved his ship and the greater part of his cargo by throwing overboard a portion of it, of little value. The judge agreed that the master might have saved his ship and the greater part of his cargo by a jettison of a part of it, but he said "that experience has taught him that masters generally delay this operation until it is too late to be available to them." He decreed the wreckers $7,000 salvage.

The case now under consideration will compare with any of these just cited from decisions made by Judge Webb in point of merit, and in several important particulars far surpassed them. In each of the cases cited the ship was more or less damaged on the reef, and required to be hove out and repaired before she could proceed on her voyage, and thus other heavy expenses besides salvage were incurred. In the present case the promptness, activity, and energy of the wreckers saved the ship in an almost uninjured condition, when she was in equally as perilous a situation as any of the vessels in the cases cited. Such promptness and energy is positive merit in the wreckers, and is to be encouraged among them, on this coast, by liberal rewards. Their conduct, too, throughout, in the present case, has been fair, honorable, and praiseworthy. They have not attempted to enhance the value of their services in the mind of the court by any misrepresentations or unfair means, but have presented the case to the consideration of the court upon its fair merits. The value of the ship and cargo, as I have remarked, may be fairly estimated at $95,000, and, when I consider that the services of the wreckers have greatly contributed (if they have not been the sole means) to save this large amount of property, under all these circumstances of promptness, energy, and good conduct,—qualities which it is highly proper to encourage among the wreckers on this coast,—I cannot think that the sum of $13,500 is too high a reward to decree to them for their services. In my judgment this is a liberal compensation, as I intend it to be. Their vessels are of the larger class of wrecking vessels, and are well fitted and manned to do good service on this coast. The number of the salvors is not so great but that, upon a division of the salvage, the share of each will be considerable, nor is their number so small as to make the share, upon a proper division, exorbitant or extravagant. I deem this sum a liberal and sufficient compensation, although I do not expect it will equal the hopes and expectations of the salvors. These are often unreasonable and extravagant. It seems to grow out of the nature and character of their business and pursuits to entertain fanciful and extravagant ideas and hopes of the acquisition of sudden wealth by receiving large rewards for their services. But, although they may, now and then, receive a large renumeration for a few hours of labor and exertion, it will be found by experience that a continued and steady employment in the business of wrecking will, in the end, leave the wrecker in no better circumstances in life than he would have been in any other pursuit. The business is, and has long been, fully open to competition, and no increased rate of salvage compensation, no degree of liberality in rewarding salvage services, can possibly, in the end, result to the pecuniary advantage of the wrecker. Increased compensation must and will inevitably induce an increased number of persons to engage in the business, and their numbers must and will increase, until, by competition, and the additions made to the numbers to divide its profits, it is brought to the condition of being no more profitable than the ordinary business of life. As a permanent class, these engaged steadily in the business of wrecking on this coast, their true and lasting interests will be best promoted by withholding any extraordinary and extravagant rewards, and thus prevent an unreasonable and immoderate number from engaging in it; and by moderate and reasonable compensations, measured out to them with a steady and even hand, avoiding extravagance on the one hand, and illiberality on the other. The true and permanent interest of the wrecker is entirely in harmony with the general interests of commerce. The interests of the former require that no extravagant hopes of sudden wealth should be realized, and thus by a bad example, tempt too many to engage in their business; and the interests of the latter require that the wrecker should be fairly and reasonably compensated, so that too many will not abandon the business, and thus deprive the commerce of these seas of their timely aid in moments of distress and danger. I am satisfied that the sum named is a fair and reasonable compensation in the present case.

In regard to permitting the salvors to pay the ship's crew the two dollars a day promised them for their services, while the ship was on the reef, I have come to the determination of positively interdicting it. The conduct of this crew was insubordinate and almost mutinous, and, instead of being paid an extra reward for their labor, they deserve punishment. There is not the slightest ground upon which to justify their pretence that they were not bound to work because the ship was a wreck, and wreckers had been employed. They were bound by their articles, by their duty, by every consideration of moral honesty, by their pride and ambition as seamen, if they had any, to stand by their commander in this trying moment of danger and distress, and not abandon their duty, prove traitorous to their plighted en-

gagements, and recreant to every principle of honor. They ought to have done their duty and stood by their commander as long as two planks of the ship remained together to stand upon, and then, if, having behaved well, the ship were at last lost, they might perhaps be entitled to some compensation for extraordinary services, rendered in saving any portion of the materials and cargo. But their conduct in the present case is without excuse. I cannot censure the salvors, or blame the master, for yielding in this moment of anxiety, peril, and distress to the unlawful demands of the ship's crew, though so cruel and unreasonable; but I shall take it upon myself to see that they do not receive the rewards of their bold, faithless, and dishonorable conduct. The conduct of the master of the ship throughout seems to have been highly commendable and praiseworthy.

Therefore it is ordered, adjudged, and decreed that the libellants have, recover, and receive the sum of thirteen thousand five hundred dollars, in full compensation as salvage for their services rendered to the said ship York and cargo, while ashore upon the Florida Reef in manner and form as fully set forth in the libel in this case; and that, upon the payment of said sum and the costs and expenses of this suit, the marshal restore said ship and cargo to the master thereof, for and on account of whom it may concern. And it appearing to the court that the crew of said ship, except the officers and boys, did, while the said ship was ashore upon the Florida Reef, wrongfully and unlawfully refuse to do duty on board said ship, and did behave in an insubordinate and highly improper manner, and were only induced to return to duty again by promises of reward and compensation to be made them by the libellants herein, and it being considered by this court wrong, and of evil example, that they should receive a reward for their misconduct and insubordination; it is therefore ordered that the libellants refrain and do not pay to any of said crew any sum of money whatever for their services on board said ship, under the penalties that shall come for a violation hereof.